JEREMY DELICINO (CA Bar 296120)
550 West C Street, Suite 620
San Diego, California 92101
jeremy@jeremydelicino.com
(619) 357-6677

JAMES JOHNSON (CA Bar 229811)
100 Wilshire Boulevard, Suite 700
Santa Monica, California 90401
james@johnsontrial.com
(424) 272-6680

Counsel for Plaintiffs

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Elizeo Velazquez-Hernandez, Fernando Girarte-Alcala, Rigoberto Campos-Atrisco, Erick Aranda-Moreno, and Jose Carrillo-Valdez.<br><br>Plaintiffs-Petitioners,<br><br>v.<br><br>U.S. IMMIGRATION AND CUSTOMS ENFORCMENT, TONY H. PHAM, in his official capacity as Senior Official Performing the Duties of the Director, Gregory Archambeault, U.S. Department of Homeland Security, Rodney S. Scott, Customs and Border Protection, Aaron Heitke, Customs and Border Protection, and Chad Wolf, in his official capacity as Acting Secretary of the United States Department of Homeland Security.<br><br>Defendants-Respondents. | Case No. 20-CV-02060-DMS-AHG<br><br>Hon. Dana M. Sabraw<br>Courtroom 13A<br><br>**FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF** |

## **INTRODUCTION**

1.     This case presents a challenge to the federal government's policy permitting civil courthouse arrests in the Federal District Court for the Southern District of California, brought by a group of people charged with illegal entry in violation of 8 U.S.C. § 1325 as part of the government's Operation Streamline. Based on specific findings by a federal judge that each plaintiff is not a sufficient flight risk or sufficiently dangerous to remain in federal custody, each was released on bail and remains out of custody pending upcoming hearings in their respective petty offense misdemeanor criminal prosecutions. The judges' findings were well founded, as each plaintiff has appeared for their hearings. In fact, Defendants *count on* Plaintiffs' lack of flight risk, lying in wait to arrest them again when they do appear for their hearings. Since the beginning of Operation Streamline in the Southern District of California in 2018, officers from the Department of Homeland Security (DHS), comprised of Immigration and Customs Enforcement (ICE) and Customs and Border Protection (CBP), have patrolled the courtrooms and courthouses of the United States District Court in the Southern District of California. In effect, they punish people for respecting federal court orders to appear for their criminal hearings.  By insisting Plaintiffs be re-arrested for their removal process, these agencies threaten the integrity of the criminal proceedings and ignore the reasonable alternative, namely that their interests in initiating the removal process for these Plaintiffs – individuals who have been found to be neither flight risks or dangers to the community and who indeed appear when the government asks them to – can be accomplished without having to arrest them.

2.     Plaintiffs assert their rights to be free from *civil* arrest in this Complaint. To be clear, Plaintiffs do not argue that the Defendants could not effectuate criminal arrests in the courthouse. But DHS arrests that merely place a person in immigration proceedings are civil arrests. *See I.N.S. v. Lopez-Mendoza*, 468 U.S. 1032, 1039 (1974) (holding that deportation proceedings are "purely"

civil); *Arizona v. United States*, 567 U.S. 387, 407 (2012) (holding that "it is not a crime for a removable alien to remain present" in the United States and that deportation proceedings are civil, even if criminal conduct is the reason for the deportation).

3.     DHS officers attend hearings related to the Plaintiffs' petty misdemeanor prosecutions equipped with handcuffs and ready to civilly arrest Plaintiffs should the misdemeanor cases conclude. The anticipated arrests occur regardless of how the misdemeanor cases end, whether it be through a Government motion to dismiss, the Court's granting of a defense motion to dismiss, a guilty verdict or an acquittal after trial. The outcome of the case makes no difference – the officers are waiting to effectuate a warrantless civil arrest in the courtroom or in the hallway outside the courtroom.

4.     Despite widespread opposition to this practice, DHS has not only refused to stop it, but has issued formal policies authorizing civil courthouse arrests. DHS's courthouse arrest policies, and its extensive practice of conducting civil arrests in courthouses, are unprecedented in American history. DHS's courthouse arrest policies are arbitrary and capricious for a multitude of reasons including their failure to explain this historic deviation in policy, the application of the policies is inconsistent, and the policies fail to advance legitimate immigration enforcement interests.

5.     Defendants have already had Plaintiffs in custody and processed their biometrics and backgrounds, including all information necessary for civil immigration enforcement purposes. They have no interest in re-arrest for those reasons. Their only interest is to keep Plaintiffs incarcerated for their civil immigration cases. But Plaintiffs have established that their incarceration is not required for their immigration cases, as they have a proven track record of appearing for court hearings. Even for individuals whose removal is "expedited" and will not require a more lengthy immigration court process, Defendants can

accomplish those interests outside the sanctity of the courthouse and without threatening to undermine the integrity of the court's well-established criminal and bail systems.

6. In addition to deviating from prior policy, the U.S. Supreme Court long ago recognized a privilege against civil arrests for those attending court on official business—a privilege that traces its roots back to English common law and rests on the common-sense principle that the judicial system cannot function if parties and witnesses fear that their appearance in court will be used as a trap.

7. DHS's decision to flout the long-standing common-law privilege against civil courthouse arrests and to commandeer the courtrooms of the Southern District of California for federal civil immigration purposes has led Plaintiffs to reasonably fear civil arrest should they appear in court at their upcoming court dates. They know that when their case ends, an immigration agent lurking in the courtroom will be ready to civilly arrest them and place them in removal proceedings. DHS's policy to civilly arrest them in court following the conclusion of their misdemeanor prosecutions forces the Plaintiffs to choose between coming to court as ordered and exercising their common-law right to be free from civil arrest in court.

8. In addition to the Plaintiffs' own fear of civil arrest, Plaintiffs' First, Fifth and Sixth Amendment rights to present witnesses and to a public trial are violated because the policy instills fear in potential witnesses and court observers who have reason to fear civil arrest.

9. DHS's civil-courthouse-arrest policies not only undermine the administration of justice in the Southern District of California, they are also illegal for at least four reasons.

10. First, DHS's courthouse arrest policies are arbitrary and capricious in violation of the Administrative Procedures Act (APA) because the policies are insufficiently explained, fail to consider all relevant factors, and depart from prior

policy without reasoned explanation. Further, DHS's implementation of the policies is inconsistent. ICE's policy states that arrests will take place "inside" the courthouses or at "non-public entrances and exits," but arrests do not always take place inside the courthouse. For example, officers chased a client and his lawyer down Broadway Street adjacent to the courthouse and arrested the client. The lawyer asked the officers to identify themselves and to produce a warrant, and the officers refused and further ordered the lawyer to back away under threat of arrest if he did not cooperate. ICE arrests outside of a courthouse are an arbitrary and capricious application of its policy. *See Washington v. U.S. Dep't of Homeland Sec.*, No. C19-2043 TSZ, 2020 WL 1819837, at *26–27 (W.D. Wash. Apr. 10, 2020) (ruling that ICE's practice of arresting immigrants outside courthouses, instead of inside as the policy states, presents a plausible claim that the policy is arbitrary and capricious under the APA).

11.     Second, Congress never authorized DHS to conduct civil courthouse arrests because it never abrogated the longstanding and well-settled common-law privilege against such arrests. The Supreme Court has recognized that the common-law privilege against civil courthouse arrests is "well settled." *Stewart v. Ramsay*, 242 U.S. 128, 129 (1916). When Congress acts in an area governed by "long-established and familiar" common-law principles, Congress is presumed to retain those principles. *United States v. Texas*, 507 U.S. 529, 534 (1993). Here, where Congress granted the federal government a general civil-arrest power to enforce civil immigration laws, Congress retained traditional common-law limitations on that arrest power—including that such arrests cannot be made against parties and witnesses attending court on official business. Because the INA does not grant the federal government authority to conduct civil courthouse arrests in violation of the common-law privilege, DHS's policies authorizing such arrests, and its policies to conduct such arrests, exceed DHS's statutory authority and must be set aside under the Administrative Procedure Act (APA). *See* 5 U.S.C. § 706(2).

12.     Third, DHS's policies violate the Constitutional right of access to the courts, which prohibits "systemic official action [that] frustrates a plaintiff or plaintiff class in preparing and filing suits." *Christopher v. Harbury*, 536 U.S. 403, 413, 415 & n.12 (2002). Conditioning litigants' ability to access the courts on risking civil arrest creates precisely such impermissible frustration. Indeed, common-law courts created the privilege against civil courthouse arrest to prevent the intolerable chilling effect of such arrests, explaining that the fear of arrest would "prevent [parties and witnesses'] approach," obstructing "the administration of justice." *Halsey v. Stewart*, 4 N.J.L. 366, 368 (N.J. 1817). Plaintiffs are all charged with misdemeanor petty offenses and have the right to present a defense under the Sixth Amendment. Plaintiffs know, however, that if they come to court as ordered they face the specter of civil courthouse arrest whether they win or lose their case.

13.     Fourth, DHS conducts the civil courthouse arrests without a warrant authorizing the arrests as required by law. 8 U.S.C. § 1357(a)(2). Pursuant to section 1357(a)(2), DHS must have "reason to believe" that the arrestee is violating immigration law *and* that the arrestee is "likely to escape before a warrant can be obtained. . . ." DHS may be able to assert that there is reason to believe that Plaintiffs have violated immigration law, but Plaintiffs' pretrial release on bond and compliance with their release conditions defeat any argument that they pose a flight risk. DHS could have sought a warrant in the months while Plaintiffs' criminal prosecutions were pending and they were released on bond. DHS did not. Failure to obtain a warrant during the pendency of Plaintiffs' criminal cases is the product of indolence, not necessity, and it violates Plaintiffs' statutory and constitutional rights.

14.     For these reasons, and as set forth below, Plaintiffs ask this Court to declare that DHS's policies authorizing civil arrests in the U.S. courthouses of the Southern District of California are unlawful, to declare that DHS's practice of

failing to obtain a warrant for courthouse arrests is illegal, and to enjoin DHS from such activity.

## JURISDICTION AND VENUE

15. This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1346 (original jurisdiction). This Court has further remedial authority under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 & 2202 *et seq.* The United States has waived its sovereign immunity pursuant to 5 U.S.C. § 702.

16. Venue is proper in the Southern District of California because this is an action against an officer, employee, and/or agency of the United States, and a substantial part of the events or omissions giving rise to this action have occurred in this judicial district. *See* 28 U.S.C. § 1391(e)(1).

## PARTIES

17. Plaintiffs are charged in the Southern District of California with illegal entry in violation of 8 U.S.C. § 1325. Plaintiffs' criminal cases are pending, and he/she is actively litigating the case. Plaintiffs have seen immigration officers waiting in court presumably to arrest him/her at prior court appearances if the case had concluded, and believes that he/she faces likely civil immigration arrest in court following conclusion of the criminal prosecution. The following are the Plaintiffs, their criminal case numbers, and their next listed court date on the criminal case.

    a. Elizeo Velazquez-Hernandez, 19CR3066-KSC. Mr. Velazquez's next court date is November 20, 2020 at 1:30 p.m. for a bench trial.

    b. Fernando Girarte-Alcala, 20MJ20121-KSC. Mr. Girarte's next court date is December 3, 2020 at 9:00 a.m. for a status hearing.

    c. Rigoberto Campos-Atrisco, 19mj24683-KSC. Mr. Campos's next court date is December 11, 2020 at 1:30 p.m. for a bench trial.

    d. Erick Aranda-Moreno, 19MJ23381-MDD. Mr. Aranda's next court date is December 17, 2020 at 1:30 p.m. for a bench trial.

7

e. Jose Carrillo-Valdez, 19CR2880-KSC. Mr. Carrillo's next court date is January 22, 2020 at 1:30 p.m. for a bench trial.

18. Defendant U.S. Immigration and Customs Enforcement is a federal agency charged with enforcement of federal immigration laws, including execution of ICE Directive No. 11072.1 entitled "Civil Immigration Actions Inside Courthouses," dated January 10, 2018.

19. Defendant Tony H. Pham is the Senior Official performing the duties of the Director of U.S. Immigration and Customs Enforcement. On information and belief, Defendant Pham is responsible for executing the courthouse arrest policy. Defendant Pham is sued in his official capacity.

20. Defendant Gregory Archambeault is the San Diego Field Office Director of U.S. Immigration and Customs Enforcement, Enforcement and Removal Operations. He is charged with ICE enforcement in the San Diego area. Field Office Director Archambeault is sued in his official capacity.

21. Defendant Rodney S. Scott is the Chief of the United States Border Patrol. On information and belief, Defendant Scott is responsible for executing CBP's courthouse arrest policy. Defendant Scott is sued in his official capacity.

22. Defendant Aaron Heitke is the Chief Patrol Agent for CBP in the San Diego Sector. He is charged with CBP enforcement in the San Diego area. Defendant Heitke is sued in his official capacity.

23. Defendant the Department of Homeland Security is a cabinet department of the U.S. government, which oversees Defendant U.S. Immigration and Customs Enforcement and United States Border Patrol.

24. Defendant Chad Wolf is the Acting Secretary of the Defendant DHS. Acting Secretary Wolf is responsible for executing relevant provisions of Executive Order 13,768, entitled "Enhancing Public Safety in the Interior of the United States" (the "EO 13,768" or "Executive Order"), issued on January 25, 2017. Acting Secretary Wolf is sued in his official capacity.

# FACTUAL ALLEGATIONS

## I.     DHS's courthouse arrest policies

25.     Shortly after taking office, on January 25, 2017, the President issued "Executive Order 13,768: Enhancing Public Safety in the Interior of the United States."

26.     Through Executive Order 13,768, the President abandoned past deportation prioritization programs embraced by both the Bush and Obama Administrations and called for the deportation of anyone potentially removable from the United States—likely more than 11 million people.

27.     The stated policy of Executive Order 13,768 was to "[m]ake use of all available systems and resources to ensure the efficient and faithful execution of the immigration laws of the United States." Executive Order 13,768(2)(b).

28.     One way DHS has attempted to use "all available systems and resources" to implement Executive Order 13,768 is to use court appearances by civil and criminal parties, witnesses, and non-parties to execute a civil immigration arrest.

29.     Since 2018, DHS has attended federal court appearances in the Southern District of California for alleged non-citizens charged with illegal entry who have been released on bond and arrested nearly all of them in the courtroom, or courthouse, following conclusion of the cases.

30.     Defendants acknowledge the practice of courthouse arrests and condone its continued use.

31.     DHS has made clear that *anyone* who is subject to arrest by DHS may be arrested in the courthouse, and courthouse arrests are not limited solely to defendants in criminal matters.

32.     ICE Policy No. 10029.2 recognizes the following "Sensitive Locations" where immigration actions (i.e., arrests, interviews, searches, and surveillance) shall neither occur nor focus on unless exigent circumstances exist:

a. Schools (including pre-schools, primary schools, secondary schools, post-secondary schools up to and including colleges and universities, and other institutions of learning such as vocational or trade schools);

b. Hospitals;

c. Churches, synagogues, mosques or other institutions of worship, such as buildings rented for the purpose of religious services;

d. The site of a funeral, wedding, or other public religious ceremony; and

e. A site during the occurrence of a public demonstration, such as a march, rally or parade.

33.     ICE Policy No. 10029.2 recognizes the preceding list of "Sensitive Locations" is not an exclusive list, and DHS officers are required to consult with their supervisors if the location of a planned enforcement operation could reasonably be viewed as being at or near a sensitive location.

34.     However, ICE has refused to recognize courthouses as "Sensitive Locations" and maintains that it possesses full discretion to civilly arrest individuals in and around any courthouse. Similarly, CBP has refused to recognize courthouses as "Sensitive Locations."

35.     On January 10, 2018, ICE formalized its Civil Courthouse Arrest Policy in ICE Directive No. 11072.1, entitled "Civil Immigration Actions Inside Courthouses."

36.     Rather than recognizing courthouses as "Sensitive Locations," ICE's Civil Courthouse Arrest Policy "sets forth [ICE's] policy regarding civil immigration enforcement inside federal, state, and local courthouses."

37.     The courthouse arrest policy purports to vest ICE with the unbridled and boundless discretion to make civil arrests in and around virtually *any* courthouse location when ICE deems it "necessary."

38. The courthouse arrest policy states that ICE's courthouse arrests will "include" actions against "specific, target aliens with criminal convictions, gang members, national security or public safety threats, aliens who have been ordered removed from the United States but have failed to depart, and aliens who have re-entered the country illegally after being removed."

39. The courthouse arrest policy does not *limit* its arrests to these "target aliens." The policy provides that "[a]liens encountered during a civil immigration enforcement action inside a courthouse" who are not "targeted alien[s] . . . will not be subject to . . . enforcement action, *absent special circumstances*." However, the courthouse arrest policy provides no information concerning what ICE considers "special circumstances," and simply states that "ICE officers and agents will make enforcement determinations on a case-by-case basis in accordance with federal law and consistent with U.S. Department of Homeland Security (DHS) policy."

40. Problematically, the ICE courthouse arrest policy does not state what this DHS policy is, and instead cross-references two other internal DHS memoranda which say nothing about courthouse arrests and one of which explicitly states that DHS "no longer will exempt classes or categories of removable aliens from potential enforcement."[1]

41. Just like ICE, CBP does not consider courthouses to be sensitive locations according to its website. CBP's website states that "enforcement actions at courthouses will only be executed against individuals," who were listed as priorities in a prior memorandum. But this memorandum was expressly rescinded by Secretary Kelly, and the website further states that CBP will seek the "arrest of non-targeted individuals" during some undefined "exigent circumstances" at courthouses.

---

[1] *See* Elaine C. Duke, Acting Secretary of Homeland Security, Memorandum on Rescission of Deferred Action for Childhood Arrivals (Sept 5, 2017).

42.     The policies fail to account for significant issues, including the historic sanctity of courthouses and the chilling impact the policies will have on the people released on bond by a federal court.

43.     Ultimately, the courthouse arrest policy simply formalizes aspects of Executive Order 13,768, which vested DHS with unfettered discretion to use courthouses as a trap to arrest *anyone* suspected of a civil immigration violation— including criminal defendants who are honoring their bond conditions while charged with even petty offenses, victims, witnesses, and parties to civil proceedings.

**II.**     The common-law privilege against civil arrest

44.     The common-law privilege against civil arrest while attending court on official business is longstanding, tracing its origins back at least to the English courts in the eighteenth century.

45.     In England, and in the early years of this country, civil arrest, or civil capias, was a common means for initiating civil proceedings. *See* Nathan Levy, Jr., *Mesne Process in Personal Actions at Common Law and the Power Doctrine*, 78 Yale L.J. 52, 61-70 (1968). The possibility that such civil arrests could take place in court, however, posed a significant problem for the judicial system: If a party or witness's appearance in one case could be used as a trap for a civil arrest in *another* case, many parties and witnesses would not attend court. To avoid this problem, courts both in England and the United States—including the U.S. Supreme Court— recognized and strictly enforced an "inflexib[le]" privilege against the civil arrest of parties or witnesses attending court. *Page Co. v. MacDonald*, 261 U.S. 446, 448 (1923). As the Supreme Court explained, "the due administration of justice requires that a court shall not permit interference with the progress of a case pending before it, by the service of process in other suits, which would prevent, or the fear of which might tend to discourage, the voluntary attendance of those whose presence is

necessary or convenient to the judicial administration in the pending litigation." *Lamb v. Schmitt*, 285 U.S. 222, 225 (1932).

46. The common-law privilege against civil arrest while attending court on official business is longstanding, tracing its origins back at least to English courts in the eighteenth century. Blackstone's *Commentaries on the Laws of England* explained the common-law rule that "[s]uitors, witnesses, and other persons, necessarily attending any courts of record upon business, are not to be arrested during their actual attendance, which includes their necessary coming and returning." 3 William Blackstone, *Commentaries on the Laws of England* 289 (1769); *see also* 6 Matthew Bacon, *A New Abridgment of the Law* 530 (London, A. Strahan, 7th ed. 1832) ("[A]ll [] persons whatsoever, are freed from arrests so long as they are in view of any of the courts at Westminster, or if near the courts, though out of view, lest any disturbance may be occasioned to the courts or any violence used."). This principle was repeatedly endorsed by the English courts, which held that, "for the purpose of justice," and "to encourage witnesses to come forward voluntarily," they are privileged from arrest "in coming, in staying, and in returning" from court. *The King v. Holy Trinity in Wareham*, 99 Eng. Rep. 531 (1782); *see also Meekins v. Smith*, 126 Eng. Rep. 363 (1791) ("[A]ll persons who had relation to a suit which called for their attendance, whether they were compelled to attend by process or not, (in which number bail were included,) were [e]ntitled to privilege from arrest *eundo et redundo*, provided they came bona fide."); *Spence v. Stuart*, 102 Eng. Rep. 530 (1802); *Ex Parte Byne*, 35 Eng. Rep. 123 (1813).

47. The U.S. Supreme Court adopted this privilege and held that it bars service of any other civil process while attending court. For instance, in *Stewart v. Ramsay*, 242 U.S. 128 (1916), the Court described the privilege as "well settled," explaining that a litigant "should be permitted to approach [the courts], not only without subjecting himself to evil, but even free from the fear of molestation or hindrance. He should also be enabled to procure, without difficulty, the attendance

of all such persons as are necessary to manifest his rights." *Id.* at 129. The Court described it as particularly firmly established that there was an "exemption from arrest," or "capias," and held that this exemption applied to any civil process to protect the "necessities of the judicial administration, which would be often embarrassed, and sometimes interrupted, if the suitor might be vexed with process while attending upon the court for the protection of his rights, or the witness while attending to testify." *Id.* at 130. The Court later emphasized the "necessity of [the rule's] inflexibility" in order to serve its purpose of protecting litigants and witnesses in appearing in court. *Page Co.*, 261 U.S. at 448; *see also Long v. Ansell*, 293 U.S. 76, 83 (1934) (Brandeis, J.) (describing "the common-law rule that witnesses, suitors, and their attorneys, while in attendance in connection with the conduct of one suit, are immune from service in another"); *Lamb*, 285 U.S. at 225.

48. DHS's practice of civilly arresting people in the federal courthouses of the Southern District of California who are present for official court business unduly infringes upon Plaintiffs' common-law right to be free from civil courthouse arrest.

**III. DHS officers are routinely present in the U.S. courthouses in the Southern District of California to effectuate civil immigration arrests of Plaintiffs when they appear in court for their criminal prosecutions**

49. Immigration officers have arrested scores of people inside the federal courthouses of the Southern District of California.

50. Immigration officers attend nearly every court hearing for defendants who have posted bond in cases originating out of the District's "§ 1325 Duty" calendar. They attend these hearings so they can effectuate a civil courthouse arrest following the conclusion of the case. That means immigration officers are present and poised to conduct immigration arrests at every misdemeanor illegal entry court hearing and trial in the Southern District of California where the defendant is on bond.

51.     When immigration officers attend the Plaintiffs' hearings, they usually sit in the back of the courtroom and observe the entire proceeding.

52.     The officers are equipped with handcuffs and plan to effectuate a civil arrest to place the defendant in immigration custody at the conclusion of the criminal case.

**IV.     DHS officers conduct courthouse arrests without warrants in the U.S. Courthouses in the Southern District of California**

53.      On information and belief, Plaintiffs believe that DHS intends to effectuate warrantless immigration arrests of plaintiffs coming to court, while present at court, or leaving court in connection with their pending criminal cases.

54.     Plaintiffs have been out of custody on bond for months, are in compliance with the conditions of their release including attending all court hearings for the petty misdemeanor charges, and they do not present a risk of flight before DHS could obtain a warrant.

**V.     DHS's civil courthouse arrest policies harm Plaintiffs by forcing them to appear in court believing that they could be subjected to an unlawful civil arrest in the courthouse at any time**

55.     Plaintiffs are all charged with a criminal offense and have a Sixth Amendment right to testify on their own behalf at trial. At trial, their credibility as defendants would surely be challenged on cross examination. The Plaintiffs would then be permitted to call character witnesses under Fed. R. Evid. 608. But the Plaintiffs are all alleged to be undocumented aliens in the United States and their character witnesses may be similarly undocumented.

56.     Plaintiffs' decision on whether to testify at trial and call character witnesses, or other witnesses, in support of their defense is chilled by the looming presence of immigration officers in court. Plaintiffs fear that full exercise of their rights to present a defense could lead to the arrest of undocumented witnesses or members of the public who come to court to observe the proceedings.

# CAUSES OF ACTION

### COUNT I
**DHS's Courthouse Arrest Policy is Arbitrary, Capricious, an Abuse of Discretion, or Otherwise Not in Accordance with Law in Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A)**

57.     Plaintiffs incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

58.     The Administrative Procedure Act (APA) instructs courts to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A). Accordingly, defendants may only exercise authority conferred by statute. *City of Arlington v. FCC*, 569 U.S. 290, 297-98 (2013).

59.     DHS's enforcement policy that "Department personnel have full authority to arrest or apprehend an alien whom an immigration officer has probable cause to believe is in violation of the immigration laws," Exhibit L at 4, is a final agency action subject to review under the Administrative Procedure Act.

60.     DHS's policies regarding courthouse arrest are arbitrary and capricious because Defendants do not sufficiently explain to whom the policies apply, fail fully to consider the foreseeable harms and/or costs of the policies, do not adequately explain its prioritizing of civil arrests in or near courthouses over the harms triggered by those arrests, and do not adequately justify the change from Defendants' prior policies.

61.     DHS's application of their policies are further arbitrary and capricious as applied to the Plaintiffs because all of the Plaintiffs have been ruled *not* to be a risk of flight when the magistrate set bond in their criminal prosecutions. Plaintiffs are all in compliance with the conditions of their pretrial release, which is further evidence that their arrest at court does not further a legitimate need by ICE to arrest them because their removal can be accomplished without detaining them anew. Moreover, Defendants are not complying with their own policies.

16

62. Defendants' violation causes ongoing harm to Plaintiffs.

## COUNT II
### DHS's Courthouse Arrest Policies Exceed Statutory Authority in Violation of the Administrative Procedures Act, 5 U.S.C. § 706(2)(C)

63. Plaintiffs incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

64. The Administrative Procedure Act instructs courts to "hold unlawful and set aside agency action" that is "in excess of statutory jurisdiction, authority, or limitations...." 5 U.S.C. § 706(2)(C).

65. There exists a longstanding common-law privilege against civil arrest of witnesses, parties, and others attending court on official business recognized by both federal and state courts.

66. The validity of DHS authorizing civil arrest of parties and witnesses attending court depends on whether the general grant of power to conduct civil arrests somehow abrogated the well-settled common law privilege that civil arrests cannot be used to arrest parties, witnesses and others attending court on official business.

67. Given the "longstanding [] principle that statutes which invade the common law are to be read with a presumption favoring the retention of long-established and familiar principles," a statute must "speak directly to the question addressed by the common law" to "abrogate a common-law principle." *Texas*, 507 U.S. at 534 (1993) (internal quotation marks and alterations omitted). The statute authorizing DHS to conduct civil immigration arrests does not "speak directly to the question addressed by the common law"—*i.e.*, it does not speak to whether DHS can use a party or witness's appearance in court as a trap for purposes of a civil arrest. Instead, the statute simply authorizes arrest and detention, while saying nothing about how, when, or where such arrests may take place. *See* 8 U.S.C. §§ 1226(a), 1357(a). Thus, the power Congress granted to DHS to conduct civil arrests

inherently contains within it the common-law limitation that parties, witnesses, and others attending court on official business are privileged from civil arrest.

68. To the extent there is any ambiguity concerning whether the INA incorporates or abrogates the common-law privilege, the constitutional concerns raised by DHS's courthouse arrest policies, resolve that ambiguity in favor of interpreting the statute to limit DHS's authority. *See Clark v. Martinez*, 543 U.S. 371, 380-82 (2005) (when there are "competing plausible interpretations of a statutory text," courts should apply "the reasonable presumption that Congress did not intend the alternative which raises serious constitutional doubts").

69. Abrogating the common-law privilege would violate the Constitutional right of access to the courts, which prohibits "systemic official action [that] frustrates a plaintiff or plaintiff class in preparing and filing suits." *Christopher v. Harbury*, 536 U.S. 403, 413, 415 & n.12 (2002). Such "frustrat[ion]" includes not only policies that ban access outright, but also those that obstruct access. *E.g.*, *id.* at 413. Forcing noncitizen litigants to risk civil arrest in order to access the courts creates such impermissible frustration.

70. Abrogating the privilege would also infringe on Plaintiffs' Sixth Amendment rights. *See infra* Count IV.

71. DHS's policies authorize civil courthouse arrests that Congress never authorized DHS to conduct. The policies are thus "in excess of statutory jurisdiction, authority, or limitations," and is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." This Court should therefore hold it unlawful and set it aside under the Administrative Procedure Act.

72. DHS arrests based on alleged civil immigration infractions are considered civil in nature.

73. Congress' general grant of power to DHS to conduct civil arrests did not abrogate the well-settled common law privilege that prohibits civil arrests of parties, witnesses and others attending court on official business.

74. DHS's courthouse arrest policies authorizing civil arrests of people in, or traveling to or from, courthouses, and DHS's practice of carrying out civil arrests against individuals attending federal courthouses in the Southern District of California courts on official business, thus exceed DHS's statutory authority.

75. DHS's courthouse arrest policies are therefore "in excess of statutory jurisdiction, authority, or limitations," in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(C).

76. Defendants' violation causes ongoing harm to Plaintiffs.

### COUNT III
### DHS's Courthouse Arrest Policies Violate the Right of Access to the Courts

77. Plaintiffs incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

78. Defendants' actions deprive Plaintiffs of meaningful access to the federal courthouses of the Southern District of California in violation of Plaintiffs' rights under the United States Constitution.

79. Policies that ban access outright and policies that obstruct the right of access to Courts in more subtle ways are prohibited.

80. Forcing noncitizens accused of crimes to choose between exercising their right to stand trial or risk being subjected to a civil arrest at a federal courthouse in the Southern District of California impermissibly frustrates the right of access to courts, as protected by the First, Fifth, and Sixth Amendments to the United States Constitution.

81. DHS's courthouse arrest policies were adopted by Defendants without full consideration of the foreseeable harms of their policy, without adequate explanation of their prioritizing civil arrests in or around courthouses over those harms, and without adequate justification of the change from Defendants' prior policies on courthouse arrests.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

82. The courthouse arrest policies are therefore unconstitutional because they infringe on Plaintiffs' right to access the courts free from fear of civil arrest.

83. The courthouse arrest policies cause ongoing harm to Plaintiffs.

**COUNT IV**
**DHS's Courthouse Arrest Policies Violates Plaintiff's Sixth Amendment Rights**

84. Plaintiffs incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

85. DHS's courtroom arrest policies violate Plaintiffs' Sixth Amendment rights because it frustrates their access to the courts.

86. A "fundamental element of due process of law" is criminal defendants' "right to present a defense," which includes the "right to offer the testimony of witnesses, and to compel their attendance, if necessary." *Washington v. Texas*, 388 U.S. 14, 19 (1967). Government acts that "cause[] the loss or erosion" of favorable testimony violate that right. *United States v. Hoffman*, 832 F.2d 1299, 1303 (1st Cir. 1987). DHS's courthouse arrest policies threatens noncitizen witnesses with potential civil arrest upon appearance in court, likely depriving many criminal defendants of key testimony. Criminal defendants also have the right to testify on their own behalf, *see e.g.*, *Rock v. Arkansas*, 483 U.S. 44, 51-53 (1987), and to be present at crucial phases of the trial, *see e.g.*, *Illinois v. Allen*, 397 U.S. 337, 338 (1970). DHS's courthouse arrest policies impermissibly conditions a criminal defendant's exercise of these rights on exposing oneself to potential civil immigration arrest.

87. Defendants' actions deprive Plaintiffs of meaningful access to the federal courthouses of the Southern District of California in violation of Plaintiffs' rights under the Sixth Amendment of the United States Constitution.

88. Defendants' violation causes ongoing harm to Plaintiffs.

## COUNT V
### DHS's Warrantless Courthouse Arrests Violate 8 U.S.C. § 1357(a)(2) because Plaintiffs Are Not a Flight Risk and the Arrests therefore Violate the Administrative Procedures Act, 5 U.S.C. § 706(2)(A), (C)

89.     Plaintiffs incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

90.     Plaintiffs allege that DHS has not obtained a warrant for their arrest in compliance with 8 U.S.C. § 1357(a)(2). Section 1357(a)(2) authorizes DHS to make warrantless arrests only if (1) there is "reason to believe" the alien is present in the United States in violation of immigration law; __and__ (2) the alien "is likely to escape before a warrant can be obtained for his arrest. . . ."

91.     Courts have continually recognized and required strict adherence to § 1357. *See Arizona v. United States*, 567 U.S. 387, 408, 410 (2012) (holding that an Arizona statute was preempted because it purported to give Arizona law enforcement greater warrantless arrest authority "than Congress has given to trained federal immigration officers," emphasizing that warrantless arrest authority is limited to situations where there is a likelihood of escape before a warrant can be obtained); *Mountain High Knitting, Inc. v. Reno*, 51 F.3d 216, 218 (9th Cir. 1995) (holding that this statute requires an individualized determination of flight risk); *United States v. Meza-Campos*, 500 F.2d 33 (9th Cir. 1975) (applying an individualized likelihood-of-escape analysis).[2]

---

[2] *See also*, *De La Paz v. Coy*, 786 F.3d 367, 376 (5th Cir. 2015) ("[E]ven if an agent has reasonable belief, before making an arrest, there must also be a likelihood of the person escaping before a warrant can be obtained for his arrest."); *Morales v. Chadbourne*, 793 F.3d 208, 216 (1st Cir. 2015) (quoting § 1357(a)(2)) ("Without a warrant, immigration officers are authorized to arrest an alien only if they have "*reason to believe that the alien so arrested* is in the United States in violation of any [immigration] law or regulation and *is likely to escape before a warrant can be obtained for his arrest*."); *United States v. Harrison*, 168 F.3d 483, 1999 WL 26921, at *4 (4th Cir. 1999) (unpublished) (explaining that "the critical question remains did the INS believe Harrison was likely to flee before a warrant could be obtained. In making such a determination, a court examines the objective facts with the knowledge of the INS Agents"; rejecting the Government's position "that in every case in which an alien is deportable an arrest can be made without a warrant"); *Westover v. Reno*, 202 F.3d 475, 479-80 (1st Cir. 2000) (commenting

92.     DHS cannot show that Plaintiffs pose a risk of escape before it can obtain a warrant. Plaintiffs are all out of custody on bond in their petty offense prosecutions, and their release on bond required a magistrate judge to rule that they do not pose an unreasonable risk of flight. Moreover, Plaintiffs' criminal cases have all been pending for many months, and DHS could have used this time to obtain a warrant. Even if DHS can establish a reason to believe that Plaintiffs are present in the United States in violation of immigration law, it cannot establish that Plaintiffs are "likely to escape" before a warrant can be obtained when it has failed to obtain a warrant during the months while Plaintiffs' criminal cases have been pending.

93.     Plaintiffs seek to enjoin DHS from arresting them without a warrant while at court, and on their way to and from court appearances mandated by their petty offense prosecutions. Plaintiffs conclusively show that they are not "likely to escape before a warrant can be obtained," § 1357(a)(2), because they are in compliance with the court-ordered conditions of bond.

94.     Plaintiffs' cases have all been pending for months and the length of time that their cases have been pending has afforded DHS sufficient time to obtain a warrant.

95.     Plaintiffs' compliance with court orders for the pendency of their criminal cases and appearance in court as ordered defeats any argument that they pose a risk of flight before a warrant can be obtained. The Court should therefore enjoin DHS from arresting Plaintiffs without a warrant while on their way to court, at court, or departing court in connection with their illegal entry prosecutions.

_____

that an immigration arrest was "in direct violation" of § 1357(a)(2) because "[w]hile INS agents may have had probable cause to arrest Westover by the time they took her into custody, there is no evidence that Westover was likely to escape before a warrant could be obtained for her arrest").

## COUNT VI
### DHS's Warrantless Courthouse Arrests Violate Plaintiffs' Fourth Amendment Rights

96. Plaintiffs incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

97. The Fourth Amendment guarantees Plaintiffs the right to be free from "unreasonable searches and seizures. . ." Plaintiffs assert that DHS intends to arrest them when they appear in court for their illegal entry prosecutions without a warrant.

98. "[U]nlike illegal entry, mere unauthorized presence in the United States is not a crime." *Melendres v. Arpaio*, 695 F.3d 990, 1000 (9th Cir. 2012). DHS's warrantless courthouse arrests are not in response to new criminal activity; rather, DHS's warrantless courthouse arrests are used to place people in civil immigration removal proceedings.

99. DHS's warrantless courthouse arrests are not authorized by law, and the arrests violate Plaintiffs' Fourth Amendment rights to be free from unreasonable government seizure and arrest.

### REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

a. Issue an Order holding unlawful, vacating, and setting aside DHS's courthouse arrest policies.

b. Declare that DHS's courthouse arrest policies are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, in violation of 5 U.S.C. § 706(2)(A).

c. Declare DHS's courthouse arrest policies are in excess of Defendants' statutory jurisdiction, authority, or limitations in violation of 5 U.S.C. § 706(2)(C).

d. Declare that DHS's courthouse arrest policies violate the First, Fourth, and Sixth Amendments to the United States Constitution.

e. Enjoin Defendants and all of their officers, employees, agents, and anyone acting in concert with them, from implementing, applying, or taking any action whatsoever under the DHS's courthouse arrest policies and from civilly arresting parties, witnesses, and others attending, being present at, or departing from U.S. courthouses in the Southern District of California.

f. Declare DHS's warrantless courthouse arrests to be in violation of 5 U.S.C. § 706(2)(A), (C) and the Fourth Amendment.

g. Enjoin Defendants and all of their officers, employees, agents and anyone acting in concert with them, from effectuating warrantless immigration arrests of people present in court without demonstrating that it is unable to obtain a warrant because the individual circumstances of the arrestee show that he is likely to escape before a warrant can be obtained.

h. Grant such other relief as the Court deems just and proper.

Respectfully submitted,

Dated: November 9, 2020    *s/ James M. Johnson*
James M. Johnson
Email: james@johnsontrial.com

Jeremy Delicino
Email: jeremy@jeremydelicino.com

Attorneys for Plaintiffs