UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ELIZEO VELAZQUEZ-HERNANDEZ, et al.,<br><br>Plaintiffs-Petitioners,<br><br>v.<br><br>U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, et al.,<br><br>Defendants-Respondents. | Case No.: 3:20-cv-2060-DMS-KSC<br><br>**ORDER GRANTING MOTION FOR TEMPORARY RESTRAINING ORDER** |

Plaintiffs in this case challenge the United States Border Patrol's practice of using the federal courthouse as a preferred location to arrest noncitizens appearing for court hearings in order to place them in civil deportation proceedings. For the past several years, the Department of Homeland Security ("DHS"), through its sub-agency United States Border Patrol, has taken into civil immigration custody many individuals who, like Plaintiffs, appear on bond for their court trials to contest a misdemeanor illegal entry charge. Regardless of outcome, these individuals are taken into immigration custody by Border Patrol at the conclusion of their trials. Plaintiffs seek a temporary restraining order ("TRO") to enjoin DHS from conducting such courthouse arrests.

Plaintiffs allege DHS's courthouse arrest policy violates the Administrative Procedure Act ("APA") because it is arbitrary and capricious and exceeds DHS's statutory

authority by violating the common-law rule against civil courthouse arrest. Plaintiffs further allege this policy violates Plaintiffs' rights of access to the court under the First, Fifth, and Sixth Amendments to the United States Constitution, violates Plaintiffs' Sixth Amendment right to present a defense, and that DHS's practice of making courthouse arrests without a warrant violates 8 U.S.C. § 1357(a)(2) of the Immigration and Nationality Act ("INA") and the Fourth Amendment to the United States Constitution. Defendants argue the Court should deny the motion as the Court lacks jurisdiction to hear the matter, the resumption of immigration custody is not an arrest, the policy is not arbitrary and capricious, and there is no common-law privilege immunizing Plaintiffs from civil arrests at the courthouse.

It is undisputed the courthouse arrests at issue are for civil immigration enforcement only (deportation) and not for arrest due to commission of a new crime, or to apprehend an individual who poses a danger to national security or a risk to public safety. The matter has been fully briefed and argued. The Court concludes Plaintiffs have met their burden and are entitled to a TRO prohibiting DHS officers' practice of conducting civil immigration arrests at the federal courthouse. This practice deters parties and witnesses from coming to court, instills fear, is inconsistent with the decorum of the court, and degrades the administration of justice. The common-law rule against civil courthouse arrest is incorporated in the INA and ensures that courts everywhere are open, accessible, free from interruption, and able to protect the rights of all who come before the court. DHS's courthouse arrest policy violates these long-standing principles.

## I.

## BACKGROUND

Plaintiffs allege that since 2018, DHS officers have attended many federal court proceedings in the Southern District of California for noncitizens charged with misdemeanor illegal entry who have been released on bond, and arrested them in the courtroom or surrounding courthouse complex after conclusion of their criminal cases. (First Am. Compl. ("FAC") ¶ 29; Mot. for TRO 5–6.) Specifically, these officers are

United States Border Patrol agents. (*See* Decl. of Jasper Frontiero ("Frontiero Decl.") ¶ 3.) Border Patrol acknowledges its agents patrol the courthouse in order to "resume custody" of illegal-entry defendants at the conclusion of their criminal cases. (*Id.* ¶ 3; Decl. of Bradley Blazer ("Blazer Decl." ¶¶ 3–4.) Border Patrol is housed within United States Customs and Border Protection ("CBP"), and as noted is a sub-agency of DHS.

Prior to 2017, it was the federal government's policy to only undertake immigration enforcement actions at or near courthouses against "Priority 1" noncitizens. (*See* Ex. H to Mot. for TRO.) "Priority 1" was the category of individuals whom the government deemed the highest priority for deportation and consisted of "aliens who pose a danger to national security or a risk to public safety." (Ex. D to Mot. for TRO.)

Beginning in 2017 under the Trump Administration, the government shifted its priorities and increased immigration enforcement. On January 25, 2017, the President issued Executive Order 13,768, titled "Enhancing Public Safety in the Interior of the United States," which directed agencies to "employ all lawful means to ensure the faithful execution of the immigration laws of the United States against all removable aliens." (Ex. K to Mot. for TRO.) Subsequently, on February 20, 2017, then-Secretary of Homeland Security John Kelly rescinded "all existing conflicting directives, memoranda, [and] field guidance" regarding immigration enforcement priorities, pursuant to the Executive Order. (Ex. L to Mot. for TRO.)

On January 10, 2018, Immigration and Customs Enforcement ("ICE"), a sub-agency of DHS, formalized ICE Directive No. 11072.1, "Civil Immigration Actions Inside Courthouses." This Directive provides that ICE may civilly arrest on courthouse premises "aliens with criminal convictions, gang members, national security or public safety threats, aliens who have been ordered removed from the United States but have failed to depart, and aliens who have re-entered the country illegally after being removed." (Ex. M to Mot. for TRO.) Furthermore, it provides that ICE may arrest others, such as undocumented witnesses or family members, in "special circumstances." (*Id.*) "Special circumstances" are not clearly defined; the Directive states enforcement determinations will be made "on

a case-by-case basis in accordance with federal law and consistent with [DHS] policy." (*Id.*) Following the issuance of the Directive, courthouse immigration arrests increased dramatically. As one court put it, "plaintiffs infer from the more than 1700 percent increase in such arrests that the Directive actually embodies a conscious decision to conduct widespread immigration arrests in or around state courthouses, a reversal of ICE's pre-2017 policy to largely abstain from such arrests." *New York v. U.S. Immigration & Customs Enf't*, 431 F. Supp. 3d 377, 381 (S.D.N.Y. 2019); *see Washington v. U.S. Dep't of Homeland Sec.*, No. C19-2043 TSZ, 2020 WL 1819837, at *4 (W.D. Wash. Apr. 10, 2020) (noting estimated 600% upsurge in courthouse arrests and finding the record "supports a conclusion that the effect of Directive No. 11072.1 was essentially to eliminate prior constraints on 'courthouse arrests'" by ICE and CBP). This increase in immigration enforcement produced a chilling effect on noncitizens' appearances in courts. (*See* Br. of American Immigration Lawyers Association as *Amicus Curiae* in Supp. of Pls.' Mot. for TRO 9–11 (citing evidence of noncitizens' unwillingness to appear as a result of ICE arrests).)

It does not appear that CBP has issued any directive regarding courthouse arrests. As of October 2020, CBP's website states that "enforcement actions at courthouses will only be executed against individuals falling within the public safety priorities" of a November 2014 memorandum. (Ex. P to Mot. for TRO). However, this memorandum was explicitly rescinded by Secretary Kelly in February 2017. (Ex. L to Mot. for TRO.) The website indicates that non-targeted individuals may be arrested at courthouses in "exigent circumstances." (Ex. P to Mot. for TRO.)

In accordance with the change in priorities set forth in the Executive Order, in April 2018, then-Attorney General Jeff Sessions directed each United States Attorney's Office along the southern border to adopt a "zero-tolerance" policy called "Operation Streamline" for illegal entry offenses, under which the federal government began prosecuting virtually all instances of misdemeanor illegal entry under 8 U.S.C. § 1325(a). (*See* Office of the Att'y Gen., Memorandum for Federal Prosecutors Along the Southwest Border (April 6,

2018).)  In response to the increased number of illegal entry prosecutions, this District instituted a separate court calendar and procedures to handle the massive influx of cases. *See United States v. Chavez-Diaz*, No. 18MJ20098 AJB, 2018 WL 9543024, at *1 (S.D. Cal. Oct. 30, 2018), *rev'd and remanded*, 949 F.3d 1202 (9th Cir. 2020) (describing Operation Streamline and citing court statistics showing 1,152 misdemeanor § 1325(a) prosecutions in August 2018, compared to *one* in January 2018).  Typically, Border Patrol apprehends and arrests individuals such as Plaintiffs for illegal entry, then transfers them to the custody of the United States Marshals Service ("USMS") for the purposes of criminal prosecution. (Blazer Decl. ¶¶ 3–4; Frontiero Decl. ¶ 3.)  As Defendants acknowledge, many of these individuals are subsequently released on bond, resulting in Border Patrol's practice of attending court proceedings to arrest them at the conclusion of the criminal case in order to place them in deportation or removal proceedings. (*See* Blazer Decl. ¶ 4; Frontiero Decl. ¶ 3.)

Plaintiffs are individuals charged in the Southern District of California with misdemeanor illegal entry in violation of 8 U.S.C. § 1325, as part of the government's Operation Streamline. (FAC ¶¶ 1, 17.)  Plaintiffs are all released on bond after a federal magistrate judge determined they were not flight risks or sufficiently dangerous, and remain out of custody pending upcoming court appearances in their criminal cases. (*Id.* ¶ 1.)  Plaintiffs allege federal officers "attend nearly every court hearing of individuals released on bond facing charges of violating 8 U.S.C. § 1325 in order to effectuate a civil courthouse arrest following the conclusion of the case." (Mot. for TRO 5–6.)  Plaintiffs submit declarations from defense counsel who represented clients charged through Operation Streamline with violations of 8 U.S.C. § 1325. (*See* Decl. of Leila W. Morgan; Decl. of Chandra L. Peterson; Decl. of Chloe S. Dillon; Decl. of Ryan W. Stitt; Decl. of Sean McGuire.)  Counsel do not recall any case of this type concluding without a civil arrest occurring at the courthouse or in close proximity to the courthouse complex. (*See id.*)  Border Patrol agents, if permitted, intend to resume custody of Plaintiffs at the courthouse when their criminal proceedings end. (Blazer Decl. ¶ 7.)

Accordingly, Plaintiffs face arrest in and around the courthouse after their criminal cases conclude. (FAC ¶ 7.) On October 20, 2020, Plaintiffs commenced the present action and filed the subject motion. On November 10, 2020, Plaintiffs filed a First Amended Complaint, removing as plaintiffs individuals whose criminal cases had concluded. Defendants have stipulated to refrain from their immigration enforcement practices pending the Court's ruling on the TRO.

## II.

## DISCUSSION

Plaintiffs seek a TRO restraining DHS officers' practice of conducting civil immigration arrests of "parties, witnesses and others attending, being present at, or departing from" the federal courthouses in the Southern District of California. (FAC, Request for Relief, ¶ e.)[1] Before turning to the merits and other injunctive relief factors, the Court addresses Defendants' jurisdictional arguments that review is barred by 8 U.S.C. §§ 1252(b)(9), 1252(g), 1226(e), and the APA.

Section 1252 does not foreclose the Court's review in this case. The Supreme Court has stated "§ 1252(b)(9) does not present a jurisdictional bar where those bringing suit are not asking for review of an order of removal, the decision to seek removal, or the process by which removability will be determined." *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1907 (2020) (internal quotation marks, alteration, and citation omitted); *see Jennings v. Rodriguez*, 138 S. Ct. 830, 840–41 (2018) (cautioning against an overly broad interpretation of the "arising from" language used in § 1252). As the Ninth Circuit explains, "§ 1252(b)(9) is a 'targeted' and 'narrow' provision that 'is certainly not a bar where, as here, the parties are not challenging any removal proceedings.'" *Gonzalez v. U.S. Immigration & Customs Enf't*, 975 F.3d 788, 810 (9th

---

[1] The Southern District of California includes San Diego and Imperial counties and two courthouses, one in each county. The enforcement actions at issue involve the San Diego courthouse but could expand to the federal court in Imperial county. Accordingly, the relief requested applies to both courthouses.

Cir. 2020) (quoting *Dep't of Homeland Sec.*, 140 S. Ct. at 1907). Similarly, although 8 U.S.C. § 1252(g) provides that no court shall have jurisdiction to hear any claim "arising from" the decision to "commence proceedings, adjudicate cases, or execute removal orders" against an undocumented person, this language does not "sweep in any claim that can technically be said to 'arise from' the three listed actions of the Attorney General," but "refer[s] to just those three specific actions." *Jennings*, 138 S. Ct. at 841 (citing *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 482–83 (1999)). Here, Plaintiffs do not challenge their immigration proceedings, removal orders, or DHS's authority to remove them. Rather, their challenge is to DHS's practice of courthouse arrests and failure to obtain warrants for their arrest, which are collateral to their removal. Therefore, review is not foreclosed under either § 1252(b)(9) or § 1252(g).

Defendants' argument under § 1226(e) also fails. Section 1226(e) prohibits a court from setting aside any discretionary "action or decision" by the Attorney General "regarding the detention or release of any alien or the grant, revocation, or denial of bond or parole." However, § 1226(e) does not bar a "constitutional challenge" to the "statutory framework" permitting detention without bail. *Demore v. Kim*, 538 U.S. 510, 510 (2003). Such a challenge is not a matter of "discretionary judgment," "action," or "decision," and thus falls outside the scope of § 1226(e). *Jennings*, 138 S. Ct. at 841. Here, again, Plaintiffs' challenge is not to any individual discretionary decision regarding their detention or release. Rather, Plaintiffs challenge DHS's courthouse arrest policy as arbitrary and capricious, exceeding statutory authority, and unconstitutional. Section 1226(e) does not preclude review of these claims.

Defendants next contend their decisions regarding arrests are "committed to agency discretion by law" under the APA and therefore unreviewable. 5 U.S.C. § 701(a)(2). Defendants argue that law enforcement officials' decisions on when and how to arrest suspects are discretionary functions. But Plaintiffs' challenge is not to the discretionary decisions of when and how each Plaintiff will be arrested, nor to DHS's decision to arrest particular individuals as opposed to others. "[Plaintiffs] challenge instead what they allege

to be a categorical policy to conduct immigration arrests in particular places where the statute (implicitly) and the common law (explicitly) do not permit such arrests. Such a policy would not be committed to unreviewable agency discretion." *New York*, 431 F. Supp. 3d at 385–86; *see also Washington*, 2020 WL 1819837, at *6 (rejecting DHS's argument that determination of where civil immigration enforcement actions will occur is committed to agency discretion).

With these findings, the Court turns to the TRO. The purpose of a TRO is to preserve the status quo before a preliminary injunction hearing may be held; its provisional remedial nature is designed merely to prevent irreparable loss of rights prior to judgment. *Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers*, 415 U.S. 423, 439 (1974). The standard for issuing a temporary restraining order is identical to the standard for issuing a preliminary injunction. *Lockheed Missile & Space Co., Inc. v. Hughes Aircraft Co.*, 887 F. Supp. 1320, 1323 (N.D. Cal. 1995). Injunctive relief is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). To meet that showing, Plaintiffs must demonstrate "'[they are] likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest.'" *Am. Trucking Ass'ns v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009) (quoting *Winter*, 555 U.S. at 20).[2] Each factor is met.

---

[2] The Ninth Circuit applies separate standards for injunctions depending on whether they are prohibitory, *i.e.* they prevent future conduct, or mandatory, *i.e.* "they go beyond 'maintaining the status quo[.]'" *Hernandez v. Sessions*, 872 F.3d 976, 997 (9th Cir. 2017). To the extent Plaintiffs are requesting mandatory relief, that request is "subject to a higher standard than prohibitory injunctions," namely that relief will issue only "when 'extreme or very serious damage will result' that is not capable of compensation in damages,' and the merits of the case are not 'doubtful.'" *Id.* at 999 (quoting *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009)). Under either standard, Plaintiffs have met their burden for the reasons set out above.

Likelihood of Success. "The first factor under *Winter* is the most important—likely success on the merits." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015). While Plaintiffs carry the burden of demonstrating likelihood of success, they are not required to prove their case in full at this stage but only such portions that enable them to obtain the injunctive relief they seek. *See Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).

Here, Plaintiffs argue they are likely to succeed on the merits because the INA incorporates a centuries-old common-law privilege against civil arrest at the courthouse, and thus Border Patrol's immigration arrests violate the APA as agency action "in excess of statutory jurisdiction, authority, or limitation." 5 U.S.C. § 706(2)(C). Defendants argue Border Patrol's actions are not arrests, and even if they are, there is no applicable common-law privilege. The Court finds Plaintiffs are likely to succeed on this claim.

First, Defendants' contention that Border Patrol retains "constructive custody" over Plaintiffs and will simply resume physical custody at the conclusion of Plaintiffs' criminal cases is without merit. Defendants imply Plaintiffs were "paroled," but "[i]n the immigration context, not all paroles are treated equally." *Garcia v. Holder*, 659 F.3d 1261, 1268 (9th Cir. 2011). Defendants make general reference to 8 U.S.C. § 1182(d)(5)(A), which authorizes "parole" for "urgent humanitarian reasons or significant public benefit." Plaintiffs contend that they are, at most, subject to "conditional parole" under 8 U.S.C. § 1226(a). There is no evidence that Plaintiffs were "paroled" under 8 U.S.C. § 1182(d)(5)(A). *See Ortega-Cervantes v. Gonzales*, 501 F.3d 1111, 115–16 (9th Cir. 2007) (distinguishing § 1182(d)(5)(A) parole from § 1226(a) conditional parole and finding alien was not paroled under § 1182(d)(5)(A) in the absence of evidence such as I-94 card). Rather, if Plaintiffs have been paroled, it appears to be pursuant to § 1226(a). *See id.* (stating aliens who are apprehended for illegal entry will generally be conditionally paroled under § 1226(a)). The government may choose to revoke such parole and "rearrest" the noncitizen. *See* 8 U.S.C. § 1226(b). Border Patrol contends they are not "rearresting" individuals such as Plaintiffs, but the statutory provision for "rearrest" does not support Defendants' theory of constructive custody. The Ninth Circuit has explained "[a]rrest is

commonly used as it is defined: 'the taking or detainment (of a person) in custody by authority of law; legal restraint of the person; custody; imprisonment.'" *Yith v. Nielsen*, 881 F.3d 1155, 1167 (9th Cir. 2018) (quoting *United States v. Leal-Felix*, 665 F.3d 1037, 1041 (9th Cir. 2011)).

After transferring Plaintiffs to USMS custody, DHS could have lodged immigration detainers on Plaintiffs, which would cause them to be remanded directly back to ICE custody upon their bond being posted. (*See* Blazer Decl. ¶ 3.) Here, instead, DHS "exercised its discretion not to lodge detainers on the named Plaintiffs." (Blazer Decl. ¶ 7.) Each Plaintiff was subsequently ordered released from custody on bond by a federal magistrate judge. (Pls.' Reply in Supp. of Mot. for TRO 1.) Defendants' cases are inapposite as they involve criminal parolees, post-conviction supervision, or the transfer of immigration detainees for housing purposes, and Defendants do not cite any case with facts analogous to the present circumstances to support their theory of continuous constructive custody. Border Patrol's enforcement actions are properly characterized as arrests.

Next, Defendants argue that the INA does not incorporate a common-law privilege against civil courthouse arrest, and in any event, the privilege does not apply to Plaintiffs. Defendants' arguments are unpersuasive.

Historically, English courts recognized a privilege against civil arrest for individuals appearing in court. As Blackstone explained: "Suitors, witnesses, and other persons, necessarily attending any courts of record upon business, are not to be arrested during their actual attendance, which necessarily includes their coming and returning. And no arrest can be made … in any place where the king's justices are actually sitting." 3 William Blackstone, *Commentaries on the Laws of England* 289 (1768). The privilege arose from two distinct concerns produced by civil courthouse arrests. First, civil arrest deterred parties from coming to court voluntarily. *See, e.g.*, *Walpole v. Alexander*, 99 Eng. Rep. 530, 531, 3 Dougl. 45, 46 (1782) (explaining privilege "encourage[s] witnesses to come forward voluntarily"). Second, it "would give occasion to perpetual tumults, and was

altogether inconsistent with the decorum which ought to prevail in a high tribunal." *Orchard's Case*, (1828) 38 Eng. Rep. 987, 987.

As service of process became the more common method for securing personal jurisdiction over a civil defendant, courts ruled that the privilege against *capias*—civil arrest—applied equally to protect individuals from service of process while attending court. *See, e.g.*, *Halsey v. Stewart*, 4 N.J.L. 366, 368 (N.J. 1817) ("It is often matter of great importance to the citizen to prevent the institution and prosecution of a suit in any court … and the fear that a suit may be commenced there by summons will as effectually prevent his approach as if a *capias* might be served upon him.").

This traditional common-law privilege against civil arrest or service of process at the courthouse continued into American common law, where it was recognized as well-established into the twentieth century. In *Stewart v. Ramsay*, 242 U.S. 128 (1916), the Supreme Court articulated the privilege as follows: "The true rule, well founded in reason and sustained by the greater weight of authority, is that suitors, as well as witnesses, coming from another state or jurisdiction, are exempt from the service of civil process while in attendance upon court, and during a reasonable time in coming and going." *Id.* at 129. *Stewart* elucidates several key points. The privilege belongs not to the defendant, but to the court. *Id.* at 130. This is because it is "founded in the necessities of the judicial administration," which would be "embarrassed" or "interrupted" if parties or witnesses were subject to civil arrest or summons while attending court. *Id.* (quoting *Parker v. Hotchkiss* (1849) 1 Wall. Jr. 269). The Court cited numerous state cases from the 1800s and noted "the Federal circuit and district courts have consistently sustained the privilege." *Id.* at 131 (collecting cases).

Against this backdrop, the Court turns to the INA. Under the canon of nonderogation, "[s]tatutes which invade the common law ... are to be read with a presumption favoring the retention of long-established and familiar principles, except when a statutory purpose to the contrary is evident." *Pasquantino v. United States*, 544 U.S. 349, 359 (2005) (quoting *United States v. Texas,* 507 U.S. 529, 534 (1993) (internal

quotation marks omitted).  For this presumption to apply, the common-law rule should be "well-established" at the time of the statute's enactment. *Pasquantino*, 544 U.S. at 359–60; *United States v. Craft*, 535 U.S. 274, 288 (2002).  In determining whether a statute "invades" or enters a field addressed by common law, courts look to whether the purpose and rationale of the common law apply to the statutory context in which Congress was legislating. *See Pasquantino*, 544 U.S. at 360, 368–72.

Here, the Court finds no question that the purpose and rationale of the common-law rule against courthouse arrest apply to the statutory context in which Congress was legislating.  The privilege goes back to at least the fifteenth century and persisted for hundreds of years thereafter in English and American common law. *See New York*, 431 F. Supp. 3d at 388–89 (discussing privilege's history).  Congress enacted the INA in 1952, only twenty years after the Supreme Court reiterated the privilege in *Lamb v. Schmitt*, 285 U.S. 222 (1932). *See id.* at 225 ("[T]he due administration of justice requires that a court shall not permit interference with the progress of a cause pending before it, by the service of process in other suits[.]")

Although the INA confers broad authority to make warrantless immigration arrests, *see* 8 U.S.C. §§ 1226(a), 1357(a), those sections are silent as to whether such arrests are permitted in courthouses.  Thus, the statutes on their face do not indicate that Congress intended to abrogate the common-law privilege. *See Pasquantino*, 544 U.S. at 359 (requiring Congress to clearly state its intent to abrogate the common law).  Moreover, in 8 U.S.C. § 1357(a), Congress not only authorized immigration officers to conduct arrests, but provided for certain restrictions and permissions on where immigration enforcement could take place.  It permitted immigration officers to enter private lands within twenty-five miles of the border to make such arrests, but prohibited access to dwellings, 8 U.S.C. § 1357(a)(3), and within a reasonable distance of the border, permitted officers to board any vessel, railway car, aircraft, conveyance or vehicle, *id.*  These provisions reflect a concern with the location of arrest, just as the common-law rule does.  Congress protected the sanctity of the home from such enforcement and disruption, just as the common-law

rule shields the court and litigants from such interruption. Accordingly, the common-law rule's purpose and rationale apply to the statutory context in which Congress was legislating in 1952 when it enacted the INA, and thus the Court presumes Congress intended to retain the common-law rule.

The government points to 8 U.S.C. § 1229(e), which mentions courthouse arrests, in support of its argument that Congress knew DHS officers were making civil courthouse arrests to place noncitizens in removal proceedings. Section 1229(e)(1) requires that "[i]n cases where an [immigration] enforcement action leading to a removal proceeding was taken against an alien at any of the locations specified in paragraph (2), the Notice to Appear shall include a statement that the provisions of section 1367 of this title have been complied with." The locations specified in § 1229(e)(2) include "a courthouse." 8 U.S.C. § 1229(e)(2)(B). However, the thrust of § 1229(e) is not on the location where civil immigration enforcement is permitted, but on limiting use of information against noncitizen victims—obtained during "domestic violence, sexual assault, trafficking, or stalking" proceedings—by an immigration judge or hearing officer to make an adverse determination of deportability.

Moreover, Congress enacted § 1229(e) in 2006, over fifty years after the original INA. *See* Violence Against Women and Department of Justice Reauthorization Act, PL 109–162, January 5, 2006, 119 Stat. 2960. "The views of a subsequent Congress … form a hazardous basis for inferring the intent of an earlier one." *Bilski v. Kappos*, 561 U.S. 593, 645 (2010) (quoting *United States v. Price*, 361 U.S. 304, 313 (1960)) (internal quotation marks omitted). "When a later statute is offered as an expression of how the Congress interpreted a statute passed by another Congress a half century before, such interpretation has very little, if any, significance." *Id.* at 645 (citing *Rainwater v. United States*, 356 U.S. 590, 593 (1958)) (internal quotation marks and alterations omitted).

The district court in *Ryan v. U.S. Immigration & Customs Enforcement* found "[t]he 2006 enactment of the Violence Against Women and Department of Justice Reauthorization Act has little bearing on the court's interpretation of Congressional intent

regarding courthouse arrests in 1952, and certainly does not amount to a clearly stated intent to abrogate the common law privilege." 382 F. Supp. 3d 142, 158–59 (D. Mass. 2019). Although the district court's holding was vacated on appeal, *see Ryan v. U.S. Immigration & Customs Enf't*, 974 F.3d 9 (1st Cir. 2020), the First Circuit did not reject the finding that § 1229(e) was of little relevance. Indeed, it focused its nonderogation analysis exclusively on Congress's intent in 1952. *See id.* at 23–28.

      The Court agrees that the reference to courthouse arrest in the 2006 enactment of § 1229(e) is insufficient to find that Congress clearly intended to abrogate the common-law privilege against courthouse arrest when it enacted the INA in 1952. To the contrary, the Court presumes Congress retained the common-law rule because it was well-established at the time of enactment and applies to the context in which Congress was legislating. For these reasons, the Court follows *New York*, 431 F. Supp. 3d at 392, in finding the INA incorporates the common-law privilege against civil courthouse arrest. *See id.* at 389 (stating "continuing availability" and "breadth" of common law privilege is shown by Supreme Court's continuing application of privilege to service of process even after historical civil arrest had become obsolete and before regulatory immigration arrests had become common); *see also Washington*, 2020 WL 1819837, at *10 (finding plaintiffs plausibly alleged, at motion to dismiss stage, that INA incorporated privilege against courthouse arrest).

      Defendants argue that even if the INA incorporates the privilege, it does not apply to Plaintiffs. First, Defendants rely on *Ryan v. U.S. Immigration & Customs Enforcement*, 974 F.3d 9 (1st Cir. 2020), for the proposition that the privilege does not apply to a civil arrest made "on behalf of the sovereign." This reasoning is flawed. As Defendants acknowledge, the privilege belongs not to the parties, but to the court itself. *See Stewart*, 242 U.S. at 130 ("The privilege which is asserted here is the privilege of the court, rather than of the defendant.") (citation omitted). Defendants, and *Ryan*, neglect to consider the underlying policy which drives the privilege. The essence of the privilege is the sanctity of the court. It is "founded in the necessities of the judicial administration, which would

be often embarrassed, and sometimes interrupted, if the suitor might be vexed with process while attending upon the court." *Stewart*, 242 U.S. at 130 (citation omitted). The privilege, consistent with the constitutional right of access to the court, "enables the citizen to prosecute his rights without molestation, and procure the attendance of such as are necessary for their defence and support." *Halsey*, 4 N.J.L. at 369. This "great object in the administration of justice" is "obstructed" if parties are liable to be civilly arrested or served while attending court. *Id.* at 368. The holding in *Ryan* wholly ignores this purpose. Civil arrest—whether by a private individual or by the government—runs afoul of this privilege of the court. The Executive may have sovereign power over immigration enforcement, but the Executive does not have sovereign power over the court.

At oral argument, counsel for Defendants argued that Border Patrol's arrests do not disrupt the dignity of the court because they are conducted at the conclusion of criminal proceedings, unlike ICE arrests in state courts which delayed and disrupted ongoing proceedings. Defendants' argument once again overlooks the purpose of the privilege.

The court, as the third, independent branch of government, is a sanctuary—a place where parties and witnesses must be free from interference and intimidation to present their claims and defenses. To fulfill its constitutional duties, the court must be open and accessible in reality, and in perception. The specter of immigration sweeps at the courthouse cuts decidedly against both of these duties. The reality is that parties and witnesses are deterred from and fear coming to court, and the perception is that the Executive is using the court as an enforcement tool to effectuate its immigration goals. *Ryan*'s reasoning allows the executive branch to implement its goals without regard to the court's purposes. Here, immigration enforcement through courthouse arrests intrudes on the court's constitutional obligations, "interrupt[s]" its ability to be open and accessible through intimidation of the parties, and "embarrasse[s]" the administration of the courts. *Stewart*, 242 U.S. at 130 (stating the common-law rule is "founded in the necessities of the judicial administration") (citation omitted). The court is not an "arrest pad" nor will it ever be. The disruption caused by a blunt enforcement practice of this nature invades the

decorum and dignity of the court and its constitutional charge to protect the rights of all who come before it.

Next, Defendants argue the privilege does not protect criminal defendants, such as Plaintiffs, from civil service of process. The reasoning behind this claimed exception appears to be that the privilege does not apply to those whose attendance in court is not voluntary, and thus Plaintiffs are not entitled to the privilege because they are required to come to court for their criminal cases. Defendants rely on *Netograph Mfg. Co. v. Scrugham*, 90 N.E. 962 (N.Y. 1910), which reasoned that since the privilege is meant to encourage voluntary attendance, its purpose fails "when a suitor or witness is brought into the jurisdiction of a court while under arrest or other compulsion of law." *Id.* at 963. But *Netograph* predates *Stewart*, which found that state courts had applied the privilege "to witnesses attending voluntarily as well as those under subpoena." 242 U.S. at 130 (collecting cases). Defendants point out that the Supreme Court in *Lamb v. Schmitt*, decided after *Stewart*, cites *Netograph*. The *Lamb* Court did reference *Netograph* in passing, but its focus was on a distinctly narrower issue—whether the privilege applied to an attorney who was served with process in one case "commanding his continued presence" in a closely related case seeking "restoration of the subject-matter of the suit wrongfully removed from the custody of the court." 285 U.S. at 226. The Court noted that "immunity [from service of process], if allowed, might paralyze the arm of the court and defeat the ends of justice[,]" *id.*, and concluded under those circumstances that "[j]udicial necessities require that such immunity should be withheld," *id.* at 228. *Lamb* did not question *Stewart*'s statement that the privilege applies to witnesses compelled to attend court.

Moreover, in *Dwelle v. Allen*, 193 F. 546 (S.D.N.Y. 1912), Judge Learned Hand distinguished *Netograph*, and set forth the basis for the common-law rule: "[T]he proper test is not … whether the appearance be voluntary or not, but whether the privilege will promote the purposes of justice." 193 F. at 548–49. The New York federal court reaffirmed this test as recently as 2005, noting the "federal judiciary as a whole follows a similarly broad rule." *Estate of Ungar v. Palestinian Auth.*, 396 F. Supp. 2d 376, 380–81

(S.D.N.Y. 2005) (citing *Stewart*, 242 U.S. at 130). It stated that "treating a party who is present under compulsion of bail … differently from one under compulsion of a subpoena … makes no sense." *Id.* at 382. This rationale is sound. Even if parties or witnesses are required to attend, the threat of civil arrest may well deter them from appearing or presenting a full defense, and in such circumstances, the court's application of the privilege properly furthers the "necessities of … judicial administration." *Stewart*, 242 U.S. at 130 (citation omitted).

At oral argument, Defendants urged the Court to focus on the specific facts of Plaintiffs' cases to determine whether the privilege applies. That inquiry, however, leads inexorably to application of the privilege here. Ultimately, this is a case about an agency policy, not the lone arrest of a single defendant or litigant required to be in court. As Border Patrol acknowledges, they attend court proceedings for essentially every defendant similarly situated to Plaintiffs. (*See* Blazer Decl. ¶ 4; Frontiero Decl. ¶ 3.) There are five plaintiffs now, but there could easily be dozens tomorrow. Thus, unlike cases such as *Lamb*, which dealt with a case-by-case determination of whether the common-law privilege applied to an individual's circumstances, this case involves a government policy of conducting arrests of parties appearing before the court. This practice runs headlong into the underlying principles of the privilege against civil courthouse arrest: the right of access and the administration of justice, as recognized by the Supreme Court in *Stewart* and *Lamb*.

"[T]he policy objectives cited for hundreds of years by English and American courts to justify the common law privilege against civil courthouse arrests apply equally to modern-day immigration arrests." *New York*, 431 F. Supp. at 391. The privilege encourages witnesses to come forth voluntarily, but its "even more fundamental purpose … is to enable courts to function properly," *id.*, and "to promote the purposes of justice," *Dwelle*, 193 F. at 548–49. In *Stewart*, the Supreme Court recognized and reaffirmed that the long-standing privilege against civil courthouse arrest ultimately lies in the sanctity of the court. As it explained: "Courts of justice ought, everywhere, to be open, accessible, free from interruption, and to cast a perfect protection around every [person] who

necessarily approaches them." *Stewart*, 242 U.S. at 129 (quoting *Halsey*, 4 N.J.L. at 367) (internal quotation marks omitted). Defendants' practice of civil courthouse arrest impermissibly encroaches on the court's duty to be open, accessible and protective of the rights of all who approach. Although the executive branch has broad authority to enforce the immigration laws, it may not use the judicial branch in this manner to serve its purposes.

Accordingly, the Court finds there is a likelihood of success on Plaintiffs' APA claim that Defendants' practice of courthouse arrests exceeds statutory authority by violating the common-law rule against such arrests. In light of Plaintiffs' likely success on this claim, the Court declines to address the balance of Plaintiffs' statutory and constitutional claims.

<u>Irreparable Injury and Balance of Equities</u>. Turning to the next two factors, Plaintiffs must show they are "'likely to suffer irreparable harm in the absence of preliminary relief[,]'" and demonstrate that "'the balance of equities tips in [their] favor.'" *Hernandez v. Sessions*, 872 F.3d 976, 995 (9th Cir. 2017) (quoting *Winter*, 555 U.S. at 20). Plaintiffs have met their burden.

Defendants argue Plaintiffs cannot show harm because they will still be subject to arrest even if a TRO issues. But as discussed above, the harm of these courthouse arrests is unique because it impacts the right of access to the court and the administration of justice. Given this, the Court finds Plaintiffs have shown likelihood of irreparable harm.

The same reasoning suggests the balance of equities tips in Plaintiffs' favor. Defendants contend a TRO will simply allow Plaintiffs to evade removal from the United States. But this is a problem of Defendants' own making and has nothing at all to do with the Court. The Court does not work for, or against, the Executive; rather, it must fulfill a clarion constitutional charge: to guarantee equal and unfettered access to all litigants so they may be heard and adjudged in accordance with the rule of law. Defendants acknowledge they could have lodged immigration detainers on Plaintiffs when releasing them to USMS custody, which would have eliminated the need to re-arrest Plaintiffs at the end of their criminal proceedings. Instead, they declined to do so, which permitted Plaintiffs to be released on bond and gave rise to the policy at issue here. On the other

hand, Plaintiffs face the threat of courthouse arrest in violation of a long-standing privilege. The balance of hardships weighs in favor of Plaintiffs.

Public Interest. The final factor for consideration is the public interest. *See Hernandez*, 872 F.3d at 996. To obtain the requested relief, "[p]laintiffs must demonstrate that the public interest favors granting the injunction 'in light of [its] likely consequences,' *i.e.*, 'consequences [that are not] too remote, insubstantial, or speculative and [are] supported by evidence.'" *Id.* (quoting *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1139 (9th Cir. 2009)).

Here, the public interest is served by allowing Plaintiffs to attend their court proceedings free of the threat of civil immigration arrest. Defendants' courthouse arrest policy appears impermissibly to infringe on the common-law privilege against such arrest as incorporated in the INA, and it would not be "'in the public's interest to allow the [government] . . . to violate the requirements of federal law.'" *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1069 (9th Cir. 2014) (quoting *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012)). The public has a strong interest in voluntary participation in the court system, maintaining the dignity of the court, and the fair administration of justice. Given these purposes of the common-law privilege against civil courthouse arrests, the public interest weighs in favor of granting Plaintiffs' motion.

### III.
### CONCLUSION

For these reasons, Plaintiffs' motion for temporary restraining order is **GRANTED**. The Court **ENJOINS** the Department of Homeland Security and its sub-agencies from making a civil immigration arrest of any individual appearing in federal court in the Southern District of California while that individual is present in, or traveling to and from, court.

This Order will expire in fourteen (14) days, on November 30, 2020, unless extended for good cause or by Defendants' consent. The parties are ordered to meet and confer by no later than **November 23, 2020**, to attempt resolution of these matters. Absent

resolution, the matter will be heard on Plaintiffs' motion for preliminary injunction. The parties shall determine a mutually agreeable hearing date and briefing schedule and submit proposed dates to the Court prior to the expiration of this Order.

**IT IS SO ORDERED.**

Dated: November 16, 2020

Hon. Dana M. Sabraw
United States District Judge